# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Nathan Christopher Braun,

                Plaintiff,

v.

Tim Walz, Governor; Commission of
Corrections; Nate Knutson, Assistant
Commissioner; Chris Pawelk, Assistant
Warden of Operations Oak Park Heights;
Sherlinda Wheeler, Assistant Warden of
Administration of Oak Park Heights;
Bryon Matthews, Captain of Oak Park
Heights; Nancy Leseman, Mail Room
Lead Worker of Oak Park Heights; S.
Henry, Mail Room Worker of Oak Park
Heights; and Lt. Jason R. Hills, Mail
Room Supervisor of Oak Park Heights,

                Defendants.

Civ. No. 20-0333 (DSD/BRT)

**REPORT AND
RECOMMENDATION**

Nathan Christopher Braun, *pro se* Plaintiff.

Corinne Wright-MacLeod, Esq., Minnesota Attorney General's Office, counsel for
Defendants.

BECKY R. THORSON, United States Magistrate Judge.

     *Pro se* Plaintiff Nathan Christopher Braun is currently an inmate at the Minnesota

Correctional Facility in Stillwater ("MCF-STW"). Braun filed his Complaint on

January 24, 2020, naming Governor Tim Walz, the Minnesota Commissioner of

Corrections, the Assistant Commissioner, and officials who work at Minnesota

Correctional Facility – Oak Park Heights ("MCF-Oak Park Heights") as Defendants.[1] In his Complaint, Braun alleges that Defendants engaged in illegal censorship and violated Braun's First, Fifth, and Fourteenth Amendment rights when they denied him access to various publications or failed to notify him that they rejected prohibited publications. (Doc. No. 1, Compl.) Defendants moved to dismiss on July 20, 2020. (Doc. No. 39.) The Court granted in part and denied in part Defendants' motion on March 29, 2021. (Doc. No. 101.) The remaining claims are Braun's First Amendment claim and Fourteenth Amendment procedural due process claim against Defendants Sharon Henry, Natalie Leseman, and Jason Hills. (Doc. No. 101 at 15.)

The remaining Defendants moved for summary judgment on November 30, 2021, on the remaining claims. (Doc. No. 173, Motion; Doc. No. 175, Redacted Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") 1–2.) Braun opposed Defendants' motion with a Limited Response, a Response, and an Exhibit. (Doc. Nos. 184–86.) For the reasons stated below, this Court recommends that Defendants' motion (Doc. No. 173) be granted and that this action be dismissed with prejudice.

## I.    FACTUAL BACKGROUND

Braun challenges the Minnesota Department of Correction's Mail Policy Number 302.020, effective date of May 21, 2019, ("the DOC Mail Policy") and the withholding of two publications—the Fall 2018 Issue of *The Abolitionist* and the "MIM (Prisons)

---

[1]      As background, Braun resided at MCF-Oak Park Heights from November 9, 2018 to November 6, 2019, and from June 25, 2020 to September 3, 2021. (Doc. No. 177, Declaration of Jeffrey Gutzmer ("Gutzmer Decl.") ¶ 3, Doc. No. 177-1 at 1–3.)

Organizing Pack"—under the DOC Mail Policy. Additionally, Braun claims Defendants withheld other publications from "Critical Resistance Publishing Collective, MIM Distributors, and News & Letters" without notice of their non-delivery in violation of his liberty interest under the Fourteenth Amendment.

## A.    The DOC Mail Policy

The DOC Mail Policy prohibits incoming mail that "[c]onstitutes a risk to the safety and security of the facility, specific individuals, or the general public," "[c]ontains information, which, if communicated, would create a threat of violence, physical harm, or a breach of facility security," or contains contraband. (Doc. No. 179, Redacted Declaration of Christine Pawelk ("Pawelk Decl.") ¶ 3, Doc. No. 179-1 at 19–20.)

When "unallowable mail" comes to the facility for an incarcerated individual, a mailroom staff person sends the incarcerated individual a completed "Notice of Non-Delivery of Mail/Package." (*Id.* ¶ 4, Doc. No. 179-1 at 20.) The notice states the reason that the mail will not be delivered, and the incarcerated individual is supposed to inform the sender of the denied item. (*Id.*) The incarcerated individual has ten working days from receipt of the notice to: (1) request that the mail be destroyed; (2) request that it be returned to the sender with a copy of the notice; or (3) appeal the notice. (*Id.*, Doc. No. 179-1 at 21.)

If an incarcerated individual chooses to appeal the Notice of Non-Delivery of Mail/Package, he must send an Offender Kite Form ("kite") (a printed form issued by the DOC to incarcerated individuals for use to communicate with DOC staff) to the mailroom supervisor within ten working days of the receipt of the notice. (*Id.* ¶ 5, Doc.

No. 179-1 at 21.) Within ten working days of receipt of the incarcerated individual's appeal, the mailroom supervisor provides a written decision, and rational for that decision, to the incarcerated individual. (*Id.*) If the mailroom supervisor affirms the mailroom staff person's determination that the mail is unallowable, the incarcerated individual may submit one subsequent appeal to the Correspondence Review Authority ("CRA") within ten working days of receiving the mailroom supervisor's decision. (*Id.*) The CRA's decision is final. (*Id.* ¶ 6, Doc. No. 179-1 at 21.) If the unallowable mail is a subscribed magazine or periodical, the incarcerated individual may secondarily appeal the CRA's decision to the assistant commissioner of facility services, and if the CRA's decision is affirmed, a facility staff person also sends the publisher a notice of denial. (*Id.*, Doc. No. 179-1 at 24–25.)

**B.    Fall 2018 Issue of *The Abolitionist***

Braun alleges that Defendant Henry prevented him from receiving "a publication from Critical Resistance Publishing Collective called 'The Abolitionist'" by asserting that the publication presented a security risk. (Compl. 1.) Defendants provided a redacted Declaration from Associate Warden of Operations Christine Pawelk stating that mail room staff member Defendant Sharon Henry reviewed the Fall 2018 issue of newspaper *The Abolitionist* addressed to Braun on August 6, 2019. (Pawelk Decl. ¶ 7.) Henry concluded that the publication contained content that constituted a risk to safety and security of the facility and that it was therefore prohibited under DOC's Mail Policy. (*Id.*) Henry sent Braun a Notice of Non-Delivery of Mail/Package. (*Id.*, Doc. No. 179-1 at 32.) The Notice conveyed that the publication had been rejected for delivery to Braun because

4

it constituted "a risk to the safety and security of the facility, specific individuals or the general public . . . ." (Pawelk Decl. ¶ 7.) The same day he received the Notice, on August 6, 2019, Braun submitted a kite to the "Mailroom Lead Worker," arguing that he had a First Amendment right to the publication. (Pawelk Decl. ¶ 8, Doc. No. 179-1 at 33–34.) On August 8, 2019, DOC mail room staff member Defendant Natalie Leseman responded to Braun: "All publications are reviewed on an individual basis and can at any time be denied for violating policy. An article advocates for organized disturbance within prison walls, activities in violation of facility rules." (Doc. No. 179-1 at 33.)

Braun submitted another kite to the "Mailroom Supervisor" on August 11, 2019, claiming that Leseman had not followed the DOC Mail Policy in the handling of his appeal. (Pawelk Decl. ¶ 9, Doc. No. 179-1 at 35.) On August 21, 2019, DOC staff Defendant Lieutenant Jason Hills responded to Braun: "The publication has contents that are not allowed per DOC Mail Policy. Appeal denied. You may appeal to the CRA." (Doc. No. 179-1 at 35.) Braun appealed to the CRA on August 21, 2019. (Doc. No. 54 at 10.) On September 5, 2019, Braun received a letter response from the CRA who informed Braun that the publication issue of *The Abolitionist* had been "denied for violating MN DOC Division Directive 301.030 Contraband"[2] and that "[o]ne of the articles advocates for organized disturbances within prison walls and activities in violation of facility rules." (Pawelk Decl. ¶ 9, Doc. No. 179-1 at 36.) His appeal was denied. (Doc. No. 179-1 at 36.)

---

[2]     For clarification, the DOC's Contraband Policy includes by reference the at-issue DOC Mail Policy, which is the policy that Braun challenges in his Complaint.

Because *The Abolitionist* was a periodical, Braun was allowed a secondary appeal to the assistant commissioner of facility services. (Pawelk Decl. ¶ 10.) Braun submitted his second appeal via a kite on September 25, 2019. (Pawelk Decl. ¶ 10, Doc. No. 179-1 at 37–38.) He claimed that the DOC could not "legally censor anything merely because it talks about violence, illegal acts, etc. . . ."[3] (Doc. No. 179-1 at 37.) DOC staff Defendant Assistant Commissioner Nate Knutson responded the same day (September 25, 2019) by separate letter, explaining that his second appeal was denied because the issue of *The Abolitionist* contained "graphic depiction of violence that pose a threat to facility security in violation of DOC Division Directive 301.030 Contraband." (Pawelk Decl. ¶ 10, Doc. No. 179-1 at 39.) A month later, on October 29, 2019, Defendant Hills sent a letter to the publisher of *The Abolitionist*, Critical Resistance, which informed the publisher that the Fall 2018 issue had been "denied by the Minnesota Department of Corrections Publication Review Authority" and that "[a]n article in this issue advocates for organized disturbances within prison walls and activities in violation of facility rules. This issue will not be permitted to enter any Minnesota DOC facility." (Pawelk Decl. ¶ 10, Doc. No. 179-1 at 40.)

---

[3]     Braun noted in his September 25, 2019 kite that this was his "2nd level appeal" (and thus, presumably, a continuation of the appeals regarding the Fall 2018 issue of *The Abolitionist*). (Doc. No. 179-1 at 37.) However, Braun references a different publication—"a publication sent to me from MIM (Prisons) Distributors" (not *The Abolitionist* publisher Critical Resistance). (*Id.*) This appears to be a typo. Indeed, based on the response from Defendant Knutson, staff believed Braun was referencing *The Abolitionist*, not a separate publication, and treated it as if this were a continuation of his appeal regarding the Fall 2018 issue of *The Abolitionist*.

## C.    MIM (Prisons) Organizing Pack

In addition to *The Abolitionist*, Braun alleges that he was denied access to a "publication from MIM (Prisons)" – identified as the "MIM (Prisons) Organizing Pack." (Compl. 3.) On August 30, 2019, Defendant Henry reviewed a document, described by the sender as "September 9 Organizing Pack-MIM (Prisons)" addressed to Braun. (Pawelk Decl. ¶ 12.) Henry determined that the publication was prohibited under the DOC's Mail Policy because it "contained content that constituted a risk to safety and security of the facility." (*Id.* ¶ 12.) Later that same day, Henry sent Braun a Notice of Non-Delivery of Mail/Package informing him that the publication had been rejected because it constituted a "risk to the safety and security of the facility, specific individuals or the general public . . . ." (*Id.* ¶ 12, Doc. No. 179-1 at 1.) Braun submitted a kite to the "Mailroom Supervisor" in which he appealed the "censorship" of the publication and noted that "[t]here is nothing in the publication that violates anything in DOC Mail Policy." (Pawelk Decl. ¶ 12, Doc. No. 179-1 at 2.) Defendant Hills responded to Braun's kite on September 17, 2019, stating: "You are not allowed to receive organizing packs which this one is. The publication talks about organizing within prison walls." (*Id.*) Braun appealed to the CRA on September 19 and 22, 2019. (Doc. No. 54 at 2–3.) On October 2, 2019, the CRA sent a letter to Braun denying Braun's appeal, after determining that the publication violated the DOC Division Directive 301.030 on Contraband and that its contents constituted "a risk to the safety of the facility." (Pawelk Decl. ¶ 13, Doc. No. 179-1 at 3.)

7

**D.      Other Publications by "Critical Resistance Publishing Collective, MIM Distributors, and News & Letters"**

Braun also alleges that Defendants Henry, Leseman, and Hills "violated policy and the law by failing to notify" Braun of their rejection of other publications from "Critical Resistance Publishing Collective, MIM Distributors, and News & Letters." (Compl. 4.) As discussed above, the policy for handling mail provides that "[w]hen unallowable incoming/outgoing mail is not delivered, the offender is sent a completed Notice of Non-Delivery of Mail/Package." (Pawelk Decl. ¶ 4, Doc. No. 179-1 at 20.) The notice states the reason that the mail will not be delivered, and the incarcerated individual is responsible for informing the sender of the denied item. (Pawelk Decl. ¶ 4, Doc. No. 179-1 at 21.)

According to Braun, Defendants "did not provide [himself] or the publishers of any notice of censorship" as to these publications, and Defendants "sent [them] back to the publishers with absolutely no reason for the mail being returned." (Compl. 4.) For support, Braun filed a letter and exhibits from one of the publishers, MIM Distributors. (Doc. No. 106.) The letter is directed to the Court and references materials that the publisher mailed to Braun over the years at MCF-Oak Park Heights and Minnesota Correctional Facility–Rush City ("MCF-Rush City"). It includes exhibits that show previous letters sent from the publisher to Braun.[4] (Doc. No. 106-1 at 2–5.) Each letter lists publications the publisher has sent to Braun with an adjacent column asking whether

---

[4]      The publisher's letter, however, mistakenly calls Mr. Braun, "Mr. Brown." (Doc. No. 106 at 1.)

Braun has received the publication. (*Id.*) Braun has circled "Yes" or "No" to indicate

which mail he did and did not receive and has included his signature and date attesting to

his annotations. (*Id.*)

## II.    ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate if, "after viewing the evidence and drawing all

reasonable inferences in the light most favorable to the nonmovant, no genuine issues of

material fact exist and the movant is entitled to judgment as a matter of law." *Johnson v.*

*Carroll*, 658 F.3d 819, 825 (8th Cir. 2011) (quotation omitted). A disputed fact is

material when its resolution "might affect the outcome of the suit under the governing

law," and a factual dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). Conclusory assertions, standing alone, are not enough to create a genuine

issue of material fact. *See Bennett v. Nucor Corp.*, 656 F.3d 802, 820 (8th Cir. 2011). If

the evidence "could not lead a rational trier of fact to find for the nonmoving party, there

is no genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).

When deciding a summary-judgment motion, courts liberally construe *pro se*

pleadings and hold them to a less stringent standard than those drafted by attorneys.

*Haines v. Kerner*, 404 U.S. 519, 520 (1972). That said, a *pro se* plaintiff's claims cannot

survive a summary-judgment motion unless he has set forth specific facts showing that

there is a genuine issue for trial. *See Quam v. Minnehaha Cnty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987); *see also Anderson*, 477 U.S. at 257 (holding that the nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment").

### B.    Braun's First Amendment Claim

Braun claims that Defendants' non-delivery of the Fall 2018 Issue of *The Abolitionist* and MIM (Prisons) Organizing Pack violated his First Amendment rights. Braun has asserted both a facial and as-applied challenge to the DOC Mail Policy.[5] Defendants assert that no genuine issues of material fact exist and that they are entitled to judgment as a matter of law. Braun opposes the motion**.**

"When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related the legitimate penological interests." *Sisney v. Kaemingk*, 15 F.4th 1181, 1189–90 (8th Cir. 2021) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). To "determine when a regulation that impinges on inmates' constitutional rights is reasonably related to legitimate penological interests," courts use a "two-step, four-factor test." *Id.* at 1190 (quotations omitted). Under the first factor, (1), "there must be a valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it." *Id.* If this threshold step is satisfied, then courts move onto the second step and determine the regulation's constitutionality by

---

[5]    Under *Turner v. Safley*, 482 U.S. 78, 89 (1987), prisoners may raise both facial and as-applied challenges to prison policies. *See Sisney v. Kaemingk*, 886 F.3d 692, 697 (8th Cir. 2018).

balancing the remaining three factors: (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact that accommodation of the asserted right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the lack of ready alternatives to the regulation as evidence of the reasonableness of a prison regulation. *Id.* at 1190–91.

Though prisoners retain their constitutional rights upon incarceration, limitations may be placed on the exercise of those rights considering the needs of the penal system. *See Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004). "When an inmate raises a challenge to a prison regulation, courts acknowledge that prisoners retain certain constitutional rights, but grant deference to the determinations of prison officials in the administration of their facilities." *See Wickner v. McComb*, No. 09-cv-1219 (DWF/JJK), 2010 WL 3396918, *3 (D. Minn. July 23, 2010). Thus, when considering these factors, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

### 1.    Braun's Facial Challenge to the DOC's Mail Policy

Under a facial challenge, the Court evaluates the DOC Mail Policy to determine whether the policy is constitutional by applying the two-step, four factor *Turner* analysis.

The first step of the *Turner* analysis asks whether, under the first factor, there is a "valid, rational connection between the prison regulation and the legitimate governmental

interest put forward to justify it." *Sisney*, 15 F.4th at 1190 (citing *Turner*, 482 U.S. at 89).

The burden to prove this factor lies with the prison:

> Generally, the prison bears the burden of proving the existence of a rational connection between the challenged regulation and a legitimate government interest. This does not require proving that the regulation in fact advances the government interest, but it does require proving that the policymaker might reasonably have thought that it would. Unless a rational connection between the regulation and the asserted interest is a matter of common sense, the prison must proffer some evidence to support the existence of such a connection.

*Id.* at 1190–91 (internal citations and quotations omitted).

The DOC Mail Policy that Braun challenges prohibits incoming mail that "[c]onstitutes a risk to the safety and security of the facility, specific individuals, or the general public," "[c]ontains information, which, if communicated, would create a threat of violence, physical harm, or a breach of facility security," or contains contraband. (Doc. No. 179-1 at 19.) Its purpose is to protect "public safety," "the rehabilitation of the offender," and "facility order and security." (*Id.* at 14.) Prison policies that allow "for censorship of incoming items that are likely to incite violence" and protect prison security are neutral and rationally related to the legitimate "institutional needs of maintaining a controlled and secure environment among the prison population." *Murchison v. Rogers*, 779 F.3d 882, 887 (8th Cir. 2015) (quotation omitted). For example, in *Murchison* the Eighth Circuit held a prison policy can prohibit inmates from receiving "correspondence, written or recorded materials, or pictures" that "constitute[d] a threat to the security, good order or [] discipline of the institution" or "promote[d],

incite[d], or advocate[d] violence, disorder or the violation of state or federal law." *Id.* at 886–87.

Here, like in *Murchison*, the DOC's Mail Policy prohibits incoming mail that, among other things, "[c]onstitutes a risk to the safety and security of the facility, specific individuals, or the general public," "[c]ontains information, which, if communicated, would create a threat of violence, physical harm, or a breach of facility security," or contains contraband. (Pawelk Decl. ¶ 3, Doc. No. 179-1 at 19–20.) Moreover, the rational connection between the policy and the asserted interest is a matter of common sense. And Defendants have come forward with specific evidence to show the rational connection. Thus, the first step is satisfied because the governmental objective underlying the DOC Mail Policy at issue is legitimate and neutral, and the DOC Mail Policy is rationally related to that objective.

The second step of the *Turner* analysis balances the second, third, and fourth *Turner* factors. *Sisney*, 15 F. 4th at 1190. The second *Turner* factor asks "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 1191 (citing *Turner*, 482 U.S. at 90). "The Supreme Court has held that this factor weighs in favor of the constitutionality of a prison's regulation of incoming mail if the regulation 'permit[s] a broad range of publications to be sent, received, and read.'" *Id.* (citing *Thornburgh v. Abbott*, 490 U.S. 401, 417–18 (1989)). The DOC Mail Policy allows prisoners to receive a wide range of publications, subject to certain exceptions. (Doc. No. 179-1 at 1–13.) When a prison policy forbids certain incoming publications found detrimental to institutional security but otherwise permits a "broad range of publications

13

to be sent, received, and read," this factor is "clearly satisfied." *Thornburgh*, 490 U.S. at 418; *see also Dawson v. Scurr*, 986 F.2d 257, 261 (8th Cir. 1993) (concluding inmates had alternative means to exercise their right where a "broad range of publications" were "permitted in the prison"). Accordingly, this factor weighs in favor of finding the DOC Mail Policy constitutional.

The third *Turner* factor examines "the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Sisney*, 15 F.4th at 1191 (citing *Turner*, 482 U.S. at 90). As was the case in *Thornburgh*, the class of excluded publications here are "limited to those found potentially detrimental to order and security." *Thornburgh*, 490 U.S. at 418. These types of publications can have a "ripple effect" if circulated within the prison. *Id.* And, once in prison, these publications can be "expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct." *Id.* at 412. "Where, as here, the right in question can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike, the courts should defer to the informed discretion of corrections officials." *Id.* (quotations and citations omitted). In light of this deference, the third factor weighs in favor of finding the DOC Mail Policy constitutional.

The fourth—and final—*Turner* factor asks whether there are "ready alternatives" to the policy. *Sisney*, 15 F.4th at 1191. "[T]he existence of obvious, easy alternatives may be evidence of that the regulation is not reasonable but is an exaggerated response to prison concerns." *Id.* Braun suggests that "[a]s to an alternative, the DOC should be

14

required to clearly define in exact language the materials which constitute contraband."
(Doc. No. 52 at 12.) Braun's suggestion that the DOC should have to amend the policy is
not a ready alternative, and even if it were, Braun has not put forth any language that
would accommodate his constitutional rights. (*See* Doc. No. 184, Pl.'s Limited Resp. to
Defs.' Mot. for Summ. J. ("Pl.'s Resp.") 10–11.) Thus, Braun has failed to present a
ready alternative. *See Dean v. Bowersox*, 325 F. App'x 470, 472 (8th Cir. 2009)
("Plaintiffs did not put forth an alternative to these regulations, and thus we affirm
dismissal of the facial challenge."). This factor weighs in favor of Defendants.

Having applied the two-step, four factor set forth in *Turner*, this Court finds that
the DOC Mail Policy has a reasonable relationship to a legitimate penological objective,
and therefore the DOC's Mail Policy is facially valid. Thus, this Court recommends
dismissal of Braun's facial challenge to the constitutionality of the DOC Mail Policy.

## 2.    Braun's As-Applied Challenge to the DOC's Mail Policy

Braun also raises an "as-applied" challenge, i.e., Braun challenges the application
of the DOC Mail Policy to the two at-issue publications: the Fall 2018 Issue of *The
Abolitionist* and the MIM (Prisons) Organizing Pack. To succeed in an as-applied
constitutional challenge under *Turner*, Braun bears the burden to establish the policies are
invalid as applied to the particular publications in his case in a way that negates the
legitimate governmental concerns. *See Murchison*, 779 F.3d at 887 ("In such an as-
applied challenge, we consider whether a ban on these particular items is reasonably
related to a legitimate penological objective.") (citation and quotations omitted); *see also
Dean*, 325 F. App'x at 472.

15

In reviewing an as-applied challenge about censored publications, courts must consider that "prison officials have broad discretion to censor or restrict an inmate's receipt of a publication to serve a legitimate penological interest—including the need for institutional security." *Murchison*, 779 F.3d at 887 (citation and quotation omitted). Thus, in its review, this Court must "recognize and defer to the expertise of prison officials on what is likely to be inflammatory in the prison environment." *Id.* (citation and quotation omitted). "Nevertheless, the court must conduct an independent review of the evidence to determine if there has been an exaggerated response to prison concerns in relation to this particular item." *Id.* (citation and quotations omitted). In an as-applied challenge, the question at the summary-judgment stage is "whether a genuine dispute exists as to whether prison officials had legitimate reasons to apply the governing regulation in the particular circumstances of the prisoner's case." *Wickner*, 2010 WL 3396918, at *4.

The Court applies this standard to the publications at issue – *The Abolitionist* and MIM (Prisons) Organizing Pack. According to Defendants, the Fall 2018 issue of *The Abolitionist* constituted a risk to safety and security in the prison because it contained an article that advocated for organized disturbances within prison walls.[6] (Defs.' Mem. 17.)

---

[6]    In Braun's response, he alleges that, in the case of *The Abolitionist* (Fall 2018 issue), "it remains <u>very clear</u> that the prison authorities did not actually review the materials before they decided to censor them." (Pl.'s Resp. 12.) As support, Braun notes alleged differences between the explanations for rejection offered by the Defendants and the DOC staff. (*Id.*) First, even if there are different explanations, they provide no proof that DOC staff and Defendants did not review *The Abolitionist* (Fall 2018 issue) before censoring it. In fact, the record shows that *The Abolitionist* (Fall 2018 issue) was reviewed by several layers of DOC staff, including mailroom staff, the CRA, and the Assistant Commissioner of Facility Services. (Pawelk Decl. ¶¶ 7–14; Doc. Nos. 179-1,

Similarly, Defendants argue the MIM (Prisons) Organizing Pack promoted and encouraged organized disturbances within prison facilities. (*Id.*) The sealed declaration of Christine Pawelk offered in support of Defendants' motion explains how and why these two publications could promote and encourage organized disturbances within prison facilities based on specific evidence. (Doc. No. 178, Sealed Decl. of Christine Pawelk in Supp. of Mot. for Summ Judg. ("Pawelk Sealed Decl") ¶¶ 11, 14–15.) The Court has reviewed the sealed version of Pawelk's declaration and Defendants' explanation in their sealed version of their memorandum for why specific contents for both publications advocated for organized prison disturbances based on the theme and headings of the publications.

Braun had the opportunity to briefly review the contents of the publications during this litigation. In response, he argues that Defendants "did not have a valid reason to reject the Fall 2018 issue of *The Abolitionist* and the MIM (Prisons) Organizing Pack because in no way could a reasonable person or fact-finder construe that either publication was a risk to the safety and security of the facility" or, for that matter, any "reasonable prison official or security professional." (Pl.'s Resp. 13–14.) But at the summary-judgment stage, Braun must present *facts*. Bare arguments are insufficient. Conclusory assertions, standing alone, are not enough to create a genuine issue of material fact. *See Bennett v. Nucor Corp.*, 656 F.3d 802, 820 (8th Cir. 2011).[7]

---

179-2.) Moreover, the alleged inconsistencies do not undermine the rational for censoring this particular item. *See, e.g.*, *Murchison*, 779 F.3d at 890.

[7]    Braun argues in his response that "immediately prior to the censorship of these two publications, [he] had been receiving similar publications by the same publishers"

As required, this Court has conducted an independent review of the publications at issue. While publication content might be "seemingly innocuous to laymen," "prison officials may well conclude" that the publication content has "potentially significant implication for the order and security of a prison." *Murchison,* 779 F.3d at 887 (citing *Thornburgh*, 490 U.S. at 407). This Court's review must "recognize and defer to the expertise of prison officials on what is likely to be inflammatory in the prison environment." *Id.* at 888.

> Not only does managing a prison require expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government, prison administration is also a task that has been committed to the responsibility of those branches. As such, separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities.

*Hum. Rts. Def. Ctr. v. Sherburne Cty., Minnesota*, No. 20-cv-1817 (ADM/HB), 2020 WL 7027840, at *3 (D. Minn. Nov. 30, 2020) (internal citations and quotations omitted).

With this deference in mind, this Court finds that there has been no exaggerated response to prison concerns in relation to the Fall 2018 issue of *The Abolitionist* and the MIM (Prisons) Organizing Pack. In addition to the Court's own review of the publications, Defendants have presented some specific evidence via the sealed

---

until he filed a "civil suit within Washington County District Court in which he named S. Henry as the lead defendant." (Pl.'s Resp. 14.) Braun offers this as evidence that his publications were not rejected under the DOC Mail Policy but instead out of retaliation for his filing. However, Braun's speculation is just that – speculation. He does not present evidence nor does his argument address the constitutionality of the DOC Mail Policy as it applies to the at-issue publications.

declaration of Christine Pawelk for why certain content in the two publications implicates prison concerns to prevent disturbances that could constitute a risk to the safety and security of the facility. Accordingly, this Court finds that Defendants have satisfied the first, threshold step to show that their censorship was reasonably related to a legitimate penological objective and was not an exaggerated response.

All three of the remaining factors in the second step of the *Turner* analysis weigh in Defendants' favor. *Turner's* second factor weighs in Defendants' favor because censoring the two publications still permits a broad range of other publications to be sent, received, and read. *See Thornburgh*, 490 U.S. at 417–18.  In fact, besides many other types of permitted publications, Braun continues to receive publications and communications from one of the publishers at issue – MIM (Prisons). For example, Braun received Issue Number 13, 1997 of *MIM THEORY: The Official Theoretical Journal of the Maoist Internationalist Movement* and the September/October 2018, No. 64 issue of *Under Lock & Key*. (Decl. Gutzmer ¶ 8, Doc. No. 177-1 at 58–61.) Additionally, Braun admits that he receives other publications from MIM (Prisons), such as No. 67 issue of *Under Lock & Key* (Doc. No. 52 at 7; Doc. No. 138 at 1), and the "Culture and Revolution (MIM Theory 13)" study pack. (Doc. No. 106-1 at 2.) Accordingly, the second factor weighs in favor of Defendants.

*Turner's* third factor also weighs in Defendants' favor because the publications at issue constitute "a risk to the safety and security of DOC facilities" and if the publications were to circulate through the prison population they would create a "ripple effect" of disruption. (Defs.' Mem. 20.) In response, Braun argues that he reviewed these

19

publications in a conference room, took "many notes as to exactly what was contained within the publications, brought his notes back to his cell, and discussed the contents with other inmates" and that "[n]o disruptive, or coordinated disruptive conduct" has occurred after several months. (Pl.'s Resp. 16.) The question, however, is not whether the censored contents of the publications did create disruptive conduct, but whether the contents could cause disruptive conduct. *Murchison*, 779 F.3d at 892. "[P]rison officials need not wait until particular prohibited material causes harm before censoring it, so long as they have a 'valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.'" *Id.* at 890 (citing *Turner*, 482 U.S. at 89). As the Eighth Circuit concluded in *Murchison*, the interest being served is "not dependent on a showing of previous harms based on the same material." *Id.* "Courts are instructed to remember that prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of a prison." *Shaw v. Kaemingk*, No. 4:17-CV-04116-KES, 2020 WL 6825698, at *19 (D.S.D. Nov. 20, 2020) (citing *Murchison*, 779 F.3d at 892). Again, deferring to prison officials, the third factor weighs in favor of Defendants.

Finally, as to the fourth *Turner* factor, Braun has made no showing that any *de minimis* cost alternatives would accommodate Braun. *Turner*, 482 U.S. at 90–91. Braun argues that he has "attempted to put forth a reasonable alternative" but that "the Court simply refused to allow Braun to amend his complaint." (Pl.'s Resp. 17 ("As such it is ridiculous to entertain the defendants (sic) claim that somehow because Braun didn't

20

present a cost effective alternative means that one does not exist.").) The denial of Braun's motion to amend, however, did not preclude Braun from presenting a reasonable alternative. Indeed, Braun has provided a *de minimis* alternative in his response: "simply allow[] the publications to be received, and to implement reviewing regulations like those that are present within *Thornburgh v. Abbott*." (*Id.*) But Braun's alternative does not explain how the regulation in *Thornburgh*, which addressed similar security and safety concerns, would "fully accommodate his asserted constitutional right without compromising the valid penological interests" of the DOC. *Mayday v. Grosshuesch*, No. 4:17-CV-04168-KES, 2020 WL 4905669, at *7 (D.S.D. Aug. 20, 2020). "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Simpson v. County of Cape Girardeau, Missouri*, 879 F.3d 273, 282 (8th Cir. 2018) (rejecting the plaintiff's argument that the alternative to a challenged "postcard-only" policy was to return to the previous "letter mail policy"). But Braun has not done so here. Accordingly, the application of this factor weighs in favor of Defendants.

Based on its analysis of the *Turner* factors, this Court finds that there is no genuine dispute of fact as to whether Defendants had a valid, rational connection between the censorship of the two publications and the prison officials' interest in prohibiting the materials under the particular circumstances of this case. *See, e.g.*, *Murchison*, 779 F.3d at 891; *Wickner*, 2010 WL 3396918, at *4. Thus, this Court recommends that Defendants

are entitled to summary judgment on Braun's as-applied challenge to the DOC Mail Policy.

### 3.    Braun's Vagueness and Overbreadth Challenge

In his response to Defendants' motion for summary judgment, Braun argues the DOC Mail Policy is "unconstitutionally vague and overbroad in reach which is impermissible in a prison regulation." (Pl.'s Resp. 10–11; Compl. 5.) Specifically, Braun challenges the definition of "[u]nallowable mail" under the DOC Mail Policy, which he claims is overbroad because it does not allow mail that "[c]onstitutes a risk to the safety and security of the facility, specific individuals, or the general public." (Doc. No. 179-1 at 19; Pl.'s Resp. 10.) He also challenges the definition of "contraband" (incorporated into the DOC Mail Policy), which he claims is overbroad because it permits staff to consider "[a]ny other item determined to present a risk to the security of the facility or safety of staff and offenders/residents." (Doc. No. 179-1 at 29; Pl.'s Resp. 11.) Finally, Braun argues the DOC Mail Policy is "open to interpretation between one individual to the next, and not based upon any actual set of actual principals (sic), which a reviewing party may follow to ensure a fair and equal review of any incoming mail." (Pl.'s Resp. 11.)

The Supreme Court has "traditionally viewed vagueness and overbreadth as logically related and similar doctrines." *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983). To mount a facial vagueness challenge, the litigant must show that the potential chilling effect on protected expression is "both real and substantial." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975). Similarly, a facial overbreadth challenge requires

that "the overbreadth of a statute . . . not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973); *see also Virginia v. Hicks*, 539 U.S. 113, 119 (2003). Thus, when considering "a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494 (1982). Under these circumstances, the burden is on the plaintiff to show that a policy's prohibition on certain content is substantial. *See*, *e.g.*, *Hicks*, 539 U.S. at 122 ("The overbreadth claimant bears the burden of demonstrating . . . that substantial overbreadth exists."); *see also Hoffman Estates*, 455 U.S. at 497 ("[T]he complainant must demonstrate that the law is impermissibly vague in all of its applications.").

Braun has failed to make the requisite showing that the cited language within the DOC's Mail Policy is substantially overbroad and vague. Braun cites no examples how the DOC Mail Policy's prohibitions reach a substantial amount of constitutionally protected conduct. The DOC Mail Policy language he cites as problematic is substantially similar to the policy language in *Thornburgh*, which allowed for a broad range of publications to be sent, received, and read. (*Compare* Doc. No. 179-1 at 19, 29 (DOC Mail Policy rejecting mail that "[c]onstitutes a risk to the safety and security of the facility, specific individuals, or the general public" or "determined to present a risk to the security of the facility or safety of staff and offenders/residents"), *with Thornburgh*, 490 U.S. at 403 (mail policy rejecting mail that is determined to be "detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal

activity").) Again, Braun has the burden of demonstrating that substantial overbreadth and vagueness exists. *Hicks*, 529 U.S. at 122; *see also Hoffman Estates*, 455 U.S. at 497. Braun has not made that showing. Accordingly, this Court recommends that Braun's claim of overbreadth and vagueness, to extent they are claimed, be dismissed.

### B.    Braun's Fourteenth Amendment Procedural Due Process Claim

Defendants also move for summary judgment on Braun's claim that Defendants violated his procedural due process rights under the Fourteenth Amendment.[8] In his Complaint, Braun claims that Defendants failed to provide him and the publishers of "Critical Resistance Publishing Collective, MIM Distributors, and News & Letters" a notice of censorship after allegedly rejecting several publications. (Compl. 4.) He also claims that Defendants "sent the publications back to the publishers with absolutely no reason for the mail being returned." (*Id.*) Braun alleges that "[t]his occurred over ten times, and with each returned publication no reason was given." (*Id.*) Braun claims that Defendants' actions "deprived [him] of a protected liberty interest" and violated his procedural due process. (Pl.'s Resp. 17–21.)

"Procedural due process imposes constraints on government decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S.

---

[8]    In his response, Braun continues to argue that Defendants did not follow "the mandatory language of their own policy." (Pl.'s Resp. at 17.) But the Court has already ruled that mere violations of DOC policy do not give rise to civil liability in this case. (Doc. No. 154 at 5–6.)

319, 332 (1976). To demonstrate that his procedural due process rights have been violated, Braun must prove (1) that he had a protected liberty or property interest at stake, and (2) that Defendants deprived Braun of this interest without due process of law. *See Hopkins v. Saunders*, 199 F.3d 968, 975 (8th Cir. 1999). At the summary-judgment stage, Braun must show the existence of specific facts that create a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). Defendants argue that Braun's due process claim fails because he has not sufficiently shown facts that Defendants received and rejected publications from Critical Resistance Publishing Collective, MIM Distributors, and News & Letters without providing Braun notice that those publication had been rejected.[9]

As a preliminary matter, several of the publications Braun complains of were mailed to Braun after he filed his Complaint on January 24, 2020, and thus are not subject to his due process claim. Of the publications that Braun alleges were mailed to him *before* he filed his Complaint, for many of them Braun has failed to submit sufficient evidence that Defendants ever received them, let alone rejected them without a notice a non-delivery. For instance, Braun complains he was supposed "to receive News & Letters bi-monthly," but that Defendants instead received them and rejected them without

---

[9]    Though it is unclear, Braun appears to argue that *his* procedural due process was violated when Defendants failed to send notice of non-delivery to the publishers. Some courts have determined that a *publisher* has a liberty interest in receiving notice of non-delivery. *See generally Lane v. Lombardi*, No. 2:12-CV-4219-NKL, 2012 WL 5873577 (W.D. Mo. Nov. 15, 2012) (collecting cases). However, Braun has not explained how *Braun* has a liberty interest in a publisher receiving a notice of non-delivery.

providing a notice of non-delivery. (Pl.'s Resp. 18; Compl. 4.) As proof, he provides two kites submitted on July 10 and 16, 2019, wherein he inquired why his edition of "News & Letters" had not been delivered. (Doc. No. 54 at 30 & 77.) But these kites do not show that Defendants received the July 2019 edition of "New & Letters"; indeed, the responses from DOC staff indicate the opposite: that DOC staff had not received this publication at all. (*Id.*) Thus, Braun fails to provide sufficient evidence that Defendants ever even received many of the publications that he complains about.

To the extent Braun has shown evidence that Defendants actually received any publications, Braun has not shown that Defendants rejected those publications without a notice of non-delivery. For example, Braun submits a letter from MIM Distributors listing several publications sent to Braun; that letter includes the "September 9 Organizing Pack" sent on August 19, 2019, the same publication that is the subject of Braun's First Amendment claim. (Doc. No. 106.) But as noted above in Section I.C, Braun did in fact receive a notice of non-delivery for the "September 9 Organizing Pack" (aka "MIM (Prisons) Organizing Pack") on August 30, 2019. (Pawelk Decl. ¶ 12, Doc. No. 179-1 at 1.) Thus, Braun fails to provide sufficient evidence that Defendants rejected the at-issue publications they received without giving a notice of non-delivery.

The only other publications at issue are the publications that Defendants placed in a storage bin while Braun resided in the Administrative Control Unit ("ACU") at MCF-Oak Park Heights. As background, during "most of Braun's time" at MCF-Oak Park Heights (from November 9, 2018 to November 6, 2019), he resided in the ACU, which is a "highly restrictive housing unit." (Gutzmer Decl. ¶¶ 1, 4, 6.) Depending on their status,

26

individuals living in ACU are not allowed certain personal items pursuant to DOC Policies 301.083 (Restrictive Housing Management policy) and 301.088 (Restrictive Housing Step-Down Management Program policy), including "subscription newspapers or publications." (*Id.* ¶ 7.) If a newspaper or other publication is allowed under the DOC's mail policy, but is not allowed in the ACU under DOC Policies 301.083 and 301.088, then the newspaper or other publication is placed in the individual's restrictive housing property storage bin. (*Id.*) When an individual receives a new, less restrictive status, he may send a kite to correspond with the DOC's property department to receive any items allowed under the new status. (*Id.*)

Defendants argue that, because the at-issue publications in Braun's storage bin were delivered to Braun pursuant to DOC Policies 301.083 and 301.088, Defendants did not deprive him of those publications. (Defs.' Mem. 23–24.) Braun, on the other hand, argues in his response that Defendants, by placing the at-issue publications in Braun's storage bin without notifying him, essentially deprived him of those at-issue publications by committing "censorship by withholding." (Pl.'s Resp. 20.) Not only did Braun fail to allege this "censorship by withholding" claim regarding DOC Policies 301.083 and 301.088 in his Complaint, he also fails to show how DOC Policies 301.083 and 301.088 violated a protected liberty interest. Even if he had made such a showing that DOC Policies 301.083 and 301.088 violated a protected liberty interest, Braun must still show an "atypical and significant hardship" on him "in relation to the ordinary incidents of prison life" such that his alleged liberty interest in receiving notice of publications sent to the storage bin has been violated. *Smith v. McKinney*, 954 F.3d 1075, 1080 (8th Cir.

2020) (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1985)). But Braun has failed to show that any violation of an alleged liberty interest in receiving notice of publications sent to his storage bin constituted an atypical and significant hardship on him in relation to the ordinary incidents of prison life. Therefore, Braun has not sufficiently demonstrated a Fourteenth Amendment violation. *See, e.g.*, *King v. Dingle*, 702 F. Supp. 2d 1049, 1076–77 (D. Minn. 2010) (granting the defendants' motion to dismiss and for summary judgment where plaintiff did not allege that he suffered an atypical or significant hardship).

In sum, Braun has failed to sufficiently show facts that Defendants received and rejected publications from Critical Resistance Publishing Collective, MIM Distributors, and News & Letters without providing Braun notice that those publication had been rejected. Braun has also failed to show that Defendants, pursuant to DOC Policies 301.083 and 301.088, violated a constitutional right or that such an alleged violation constituted an atypical and significant hardship on him in relation to the ordinary incidents of prison life. Accordingly, this Court recommends Braun's Fourteenth Amendment due process claim be dismissed.

### C.    Qualified Immunity

Defendants also argue they are entitled to qualified immunity as to both Braun's First Amendment and Due Process claims. (Defs.' Mem. 8–9.) Qualified immunity shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A right is clearly established if its "contours were sufficiently definite that any reasonable official in [the defendant's] shoes would have understood that [he or she] was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate." *City & Cnty. Of S.F., Cal. v. Sheehan*, 575 U.S. 600, 611 (2015) (quotations, citations, and alterations omitted). The dispositive question is "whether it would have been clear to a reasonable officer in the [defendant's] position that their conduct was unlawful in the situation they confronted." *Wood v. Moss*, 572 U.S. 744, 745 (2014*)* (quotation and brackets omitted). In other words, "[t]he salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quotations and alterations omitted). This exacting standard "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quotation omitted).

First, as to Braun's procedural due process claims, the Eighth Circuit has held that the right to receive notice of a rejection of any form of correspondence, "regardless of whether that communication occurs in the form of a letter, package, newspaper, magazine," is a clearly established right. *Bonner*, 552 F.3d at 676 ("[T]he case law is clear that an inmate has a right to procedural due process—including notice—whenever *any form* of correspondence addressed to that inmate is rejected.") (emphasis added). But as discussed above, Braun has not produced any evidence that Defendants rejected his at-

issue publications without notice. Thus, Braun has failed to show that his right to receive notice of a rejection was actually violated. Therefore, Defendants are entitled to qualified immunity as to Braun's procedural due process claims.

Second, as to Braun's First Amendment claims, it is not evident that Defendants conduct of rejecting the delivery of *The Abolitionist* (Fall 2018 issue) and MIM (Prisons) Organizing Pack violated a clearly established statutory or constitutional right of which a reasonable person would have known. This Court finds that no reasonable DOC official would believe that withholding the *The Abolitionist* (Fall 2018 issue) and MIM (Prisons) Organizing Pack, because they threatened facility security, clearly violated established constitutional principles governing prisoner mail. *See*, *e.g.*, *Thornburgh*, 490 U.S. 401; *Turner*, 482. U.S. 78. The same is true given the Eighth Circuit's holdings. *See*, *e.g.*, *Murchison*, 779 F.3d 882. Therefore, even if Braun's First Amendment rights had been violated when Defendants withheld *The Abolitionist* (Fall 2018 issue) and MIM (Prisons) Organizing Pack, given the Supreme Court's and Eighth Circuit's holdings in prisoner mail cases similar to this one, no reasonable DOC official would have understood that he or she was violating a clearly established right to these publications. *Sheehan*, 575 U.S. at 611. Therefore, Defendants are entitled to qualified immunity on Braun's First Amendment claims.

**D.    Conclusion**

For the reasons stated above, this Court recommends that the Court grant Defendants' motion for summary judgment in its entirety and this action be dismissed with prejudice.[10]

**III.    Additional Pending Motions**

Two additional motions remain pending before the Court: (1) Braun's motion for the appointment of counsel (Doc. No. 185) and (2) Braun's Motion for Copies of Court Documents. (Doc. No. 188.)

**A.    Braun's Motion for the Appointment of Counsel (Doc. No. 185)**

Braun claims that he has been unable to adequately respond to Defendants' motion and memorandum because the DOC withheld certain legal materials "necessary" for him to litigate this case and he therefore needs the appointment of counsel. (Doc. No. 185.) However, this Court's review of Braun's most recent filings show that Braun is able to litigate this case. *See*, *e.g.*, *Nachtigall v. Class*, 48 F.3d 1076, 1081–82 (8th Cir. 1995). As the Court noted when it denied Braun's motion for appointment of counsel back in September of 2021, Braun demonstrates an ability "to articulate and pursue his claims."

---

[10]    Since this case was filed, Braun has repeatedly made "repetitive, non-meritorious, and abusive filings" to the point where the Court restricted Braun from making further filings. (Doc. No. 156.) Braun then ignored the Court's filing restriction order and attempted to file more documents. Braun's continual abusive filings and disregard for the Court's order merits a dismissal with prejudice. Thus, this Court recommends that this action be dismissed *with* prejudice. *See, e.g.*, *Hutchins v. A.G. Edwards & Sons, Inc.*, 116 F.3d 1256, 1260 (8th Cir. 1997) (upholding dismissal with prejudice where the plaintiff disregarded the district court's orders).

(Doc. No. 167 at 6.) Therefore, this Court recommends that the Court deny Braun's motion for the appointment of counsel.

**B.    Braun's Motion for Copies of Court Documents (Doc. No. 188)**

Braun requests that the Court provide him copies of the court documents, in their entirety, from six different cases that he has filed in federal court. Braun's request is not related to this litigation nor is it this Court's duty to provide those documents. Moreover, since the Court recommends dismissal for the reasons stated above, even if Plaintiff had made a reasonable request, that request should be denied as moot. Therefore, this Court recommends that this motion be denied.

## RECOMMENDATION

For the reasons stated above, and based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Defendants' Motion for Summary Judgment (Doc. No. 173) be **GRANTED**;

2.    This action be **DISMISSED WITH PREJUDICE**;

3.    Braun's request for the appointment of counsel (Doc. No. 185) be **DENIED**; and

4.    Braun's Motion for Copies of Court Documents (Doc. No. 188) be **DENIED**.

Dated: June 17, 2022                    *s/ Becky R. Thorson*
                                        BECKY R. THORSON
                                        United States Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report within **fourteen days**. A party may respond to those objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).